## Reed v. Flynn.

(Decided December 2, 1924.)

### Appeal from Grant Circuit Court.

1. Evidence—Positive Testimony as to Maintenance of Gate Held to Prevail Over Negative Testimony of Equal Number of Witnesses.—On question as to maintenance of gate across right of way, positive testimony of numerous witnesses from personal knowledge, that it was erected and stood until plaintiff tore it down, prevailed over negative testimony of equal number of witnesses that they did not remember seeing gate there.

2. Easements—Agreement for Right of Way Held to Run with Land.—Contract for right of way held to run with land as against subsequent purchaser.

3. Easements—Where Contract is Silent, Owner of Land May Erect Gates, at Termini, but Not at Intermediate Points Unless so Intended.—Where contract for right of way is silent as to gates, and contrary not shown by circumstances or conditions of the parties, owner of land may erect gates at the termini of right of way, but unless so intended gates may not be erected at intermediate points.

4. Easements—Erection of Intermediate Gate Across Right of Way Held Construction of Contract Creating Easement.—Erection of intermediate gate across right of way which remained during user's lifetime and until discontinued by subsequent grantee of servient owner because temporarily not needed, pursuant to contract requiring user to build gates necessary to complete protection of the land, is to be considered as construction of contract by acts, showing intent that gate was permitted when needed.

5. Easements—Grantee of Servient Estate, by Removing Intermediate Gate Across Right of Way While Temporarily Not Needed, Did Not Lose Right to Maintain it.—Grantee of servient estate, removing gate across right of way, because out of repair and temporarily not needed, did not thereby lose right to maintain it under contract between prior owner of estates creating easement, as against one purchasing dominant estate while gate was down

L. M. ACKMAN for appellant.

C. C. ADAMS for appellee.

Opinion of the Court by Commissioner Hobson—
Reversing.

In the year 1868 there was pending in the Grant county court a proceeding instituted by Michael Flynn v. J. H. Brown, in which Flynn sought to establish a passway from his land to the pike over Brown's land. In settlement of this suit a written contract was made on September 25, 1868, signed by them both, in which, after setting out the route of the passway as laid out by the viewers, these words were added:

> "Now, therefore, know all men by these presents that said suit is settled and compromised by and between the parties, the said Flynn is to pay all costs that have accrued in said suit except the attorney's fees of Brown, and the said Brown for and in consideration of the sum of one hundred dollars in hand, the receipt of which is hereby acknowledged, have this day and by these presents do hereby establish unto the said Michael Flynn and his heirs and assigns a right of way in and to and over said described land which is to continue unto the said Flynn, his heirs and assigns without interruption from the said Brown and his heirs and assigns so long as he may use said lands as a private passway and to all intents and purposes this passway is hereby as lawfully established as if done by a proper order of said court but not to continue any longer than the said Flynn or his heirs and assigns use the same as a private passway, and whenever the said Flynn heirs or assigns abandon and cease to use same as such then it reverts back to the said Brown and he has the right under this contract of compromise to close same.

> "The said Flynn as a part of said consideration for said passway agrees and binds himself to erect at his own cost all gates that may be necessary to the complete protection of the land of said Brown and to keep them in good and substantial repair so long as he may use said land before described as a private passway, that said land is not to be fenced in, thereby making a lane, but as a part of this contract gates are to be erected instead of a fence. The said Flynn, his heirs and assigns are to put in good and substantial posts on which to erect said gates and said gates

are to be of good and sufficient size. But it is expressly understood that in no event or case does the legal title to said land pass from the said Brown to said Flynn but only the right of way uninterrupted by the said Brown, his heirs or assigns."

A. G. Reed now owns the Brown farm, Carl K. Flynn the Flynn farm, Reed holding under Brown and Flynn under his grandfather, Michael Flynn. On May 20, 1921, Reed brought this action against Flynn, alleging these facts. He became the owner of the Brown farm in 1900 and then removed a gate that was at that time standing across the pathway and had so stood from the time that the contract was entered into. This gate stood between gates standing at either end of the passway, making three gates on it. This gate was necessary for the protection of his land, and in May, 1920, he erected the middle gate again. The defendant refused to close it or allow it to remain closed. He prayed an injunction requiring the defendant to close the middle gate and allow it to remain closed. An answer was filed controverting the allegations of the petition. A temporary injunction was refused and on final hearing the plaintiff's petition was dismissed. He appeals.

While the evidence is conflicting, the great weight of the evidence shows that for many years after the contract was made the middle gate in question existed; that it was built by Michael Flynn at Brown's request and a cross fence was run across the field so as to cut it in two fields. The passway is about 1,250 feet long; there is no dispute about the gates at either end. The field contains 17½ acres. When Reed bought the place the cross fence was in a bad condition and he did not then need the cross fence for his farming operations, so he took the fence away and the gate was discontinued. While he was living there in this way Michael Flynn bought the Flynn place and moved upon it in 1906, and has since lived there, using the passway with only two gates upon it. Reed wishes the fence so that he can cultivate part of the field in corn or tobacco and graze the remainder. There is no permanent water on one end of the field and he needs the cross fence in watering his stock at the barn. There is no contrary evidence on the facts he states showing that the cross fence and the gate are reasonably necessary for the enjoyment of the farm, although they were not necessary in 1900 when he moved there owing to the con-

dition of the farm at that time. The proof was also un contradicted that the gate will be a drawback to Flynn in the use of the passway and to some extent depreciate the value of his place. But neither of these considerations can control the case. It must be determined upon the legal rights of the parties.

At least fifteen or twenty witnesses testified to this middle gate having been erected and remaining there until it was taken down by Reed. This testimony is from the man who built it, a man who saw it built, the tenants on the place who passed through it and a number of persons speaking from personal knowledge who could not reasonably be mistaken in view of the facts they state. Upon the other hand there are about the same number of witnesses testifying that they do not remember seeing a middle gate there.

> "Affirmative evidence on a question of this sort is necessarily entitled to more weight than negative evidence; for the witnesses who testify to the absence of the gate or drawbars may have passed through when the gate was open or the drawbars not up. The witnesses who testified to the affirmative are so numerous that it is hard to believe they could be mistaken, and they are unimpeached." Lurker v. Ross, 121 S. W. 647.

This is particularly applicable for the reason that all the testimony shows that the middle gate was only kept closed when there was a crop in one side of the field and that in winter and for some years the gate was not closed at all.

Appellee insists that there was no middle gate when he bought the place with the burden only of two gates. But this cannot control the case. He is only entitled to the passway under the written contract. Without the contract he would not be entitled to go over Reed's land at all. The contract runs with the land and he must exercise his rights subject to the burden imposed by the contract. Chicago, etc., Railroad Co. v. Dodds, etc., 167 Ky. 624.

The rule in this state is that where the contract is silent as to gates and the contrary is not shown by the circumstances or condition of the parties, the owner of the land may erect gates at the point where the passway enters and leaves his land. Miller v. Miller, 182 Ky. 797.

The rule is also where the contract is silent as to gates, that the right of the owner of the land to erect gates across the passway at any other place than at its terminal will not be upheld where the consideration for the grant, the object for which it was made, the situation and condition at the time of the land, and the manner in which it had been used and occupied as a passway demonstrate that it was not the intention of the parties that the owner of the servient estate should erect gates across it at other places. Raisor v. Lyons, 172 Ky. 314.

But this case does not fall within either of these classes. The contract here is not silent; it expressly stipulates the rights of the parties, and the case must be determined upon the fair construction and effect of the written contract. The contract provides that Flynn is to erect at his own cost all gates that may be necessary to the complete protection of the land of Brown and to keep them in good order. It also provides that as a part of the contract there is to be no lane and gates are to be erected instead of a fence. It has been well said that the best way to know what the parties meant by a contract is to know what they did under it. Clearly these parties did not contemplate the erection of gates only at the termini of the passway, for they erected a middle gate and this gate erected by Flynn remained there as long as he lived. There was no dispute about this gate, not only as long as Flynn lived but as long as the gate remained. It was taken down by Reed after he bought the place when he took away the fence. The erection of this middle gate shows how the parties construed the words, "The complete protection of the land of said Brown," and what they meant by these words.

Reed lost no right under his contract by taking down the gate when he did not desire longer to keep up the cross fence which then needed repair. There was no adverse use of the passway by Vallandingham, who then owned the Flynn place. It is true there was no gate there when appellee Carl K. Flynn became the owner of the land, but this was only about fourteen years before the gate was replaced and he had acquired no rights by adverse possession up to that time.

Judgment reversed and cause remanded for a judgment as above indicated.